Good morning, your honors. I may please the court. My name is Jerry Steering. I represent the plaintiffs. I'm sure the court's read the briefs and is familiar with the Dahlia v. Rodriguez case, the Hufford case, Robinson v. York. With the time that I do have, I do want to address the issue of whether or not the individual officers should be entitled to qualified immunity because I think that's the only issue that remains in light of the on-bank decision in Dahlia v. Rodriguez. Well, I do want to talk about that with you, but I think there's also on the Monell issues that I think we need to save some time to talk about Monell on liability, but in terms of if Dahlia was decided after and apparently the district court knew about that Dahlia had been gone on bonk and then Dahlia revisited Hufford, so it puts it in a different, it clarifies it, but the officers at the time, if you want to make the devil's advocate argument is then that shows that it wasn't clearly established, so they would be entitled to qualified immunity. Well, Your Honor, there was a recent case by the Ninth Circuit last year and it talked about whether or not one qualified immunity applies and it made the bold statement that qualified immunity applies in any situation where the issue is not beyond debate. So, if you want to take it to an extreme, it could be qualified immunity could really be made in every single case that ever existed. Well, no, that's not true because, you know, it's clear that you kind of look at the officer's conduct and you could say, how could they think that that was, you know, if what you look at it, bullying someone, you know, not backing them up, trying to keep that person from testifying, I mean, officers know that's wrong. I mean, they would know that it's wrong, but under 1983, the constitutional right is her right under the First Amendment, correct, and at the time of Hufford, that it would have been her duty as a police officer to report these things, so she didn't have a First Amendment right. Dahlia then revisited that and made it clear that she, if Dahlia had existed at the time, then you have a better argument, but Dahlia didn't exist at the time, so how can you say that Dahlia was clearly established law? I'm not saying that Dahlia was clearly established law, what I'm saying is this, the harassment and the cooperation with the FBI and statements to the FBI about criminal conduct, conduct that resulted in two convictions of these officers. I know, I know. Okay. That happened in 2007. Hufford wasn't until 2009. York, Robinson v. York was a case that talked about not deciding the job qualifications or the scope of job duties on the face of the pleadings, that there had to be more factual inquiry into that. The Freetog case talks about the same thing, you have to make an inquiry into that. Garcetti makes the same claim, that you have to make an inquiry into that, so from the period from 2007 until late 2009, which is, I think Hufford came down in July of 2009. So from 2007 until July 2009, I could reasonably make the argument that based on Garcetti and Freetog and Robinson, that nobody, no reasonably well trained officer could have believed that it would have been not unlawful to retaliate against a fellow officer for making complaints of criminal conduct by them. Then you have this hiatus in 2009 with Hufford, and when Hufford comes to be, it was a two to one decision, but it flied in the face of every circuit court of appeal in the country that had worked with those issues. It stood alone by itself, and I'm suggesting that for whatever reason, I think it was Judge Tallman and Hufford decided to take this approach to just say, okay, there's a Crystal case in California from 1939 that says that an officer has the duty to report criminal conduct, and therefore we're going to say that in any situation in which they report criminal conduct, that they have done it. So how do you distinguish Lane v. Franks? Lane v. Franks was a recent U.S. Supreme Court case that talked about getting protected testimony, getting First Amendment protection for testimony, and it gave that protection, so it's distinguishable from Hufford. But they got qualified immunity there, correct? And it's a Supreme Court case. Last I checked, they're higher than us. That may be the case. And here's the biggest problem I can see with the qualified immunity analysis in any of these cases. You can make it apply in any of these cases if you want to. You can make it not apply in any of these cases if you want to. Well, and then that makes it not clearly established. That's the problem. So, you know, I find this particularly troubling in this day and age when I know that there are going to be, if you see what's going on, there's a lot of Department of Justice, FBI investigations of local police departments, and you would want people to cooperate and tell the truth. We want our law enforcement officers to tell the truth. And we have to take your allegations as being true, and what she's saying, it seems, you know, if her allegations are to be believed, they treated her terribly, they put her at risk, they took employment actions against her, but I'm having trouble shoehorning it into 1983. Okay. Well, if I can just, if I may just respond to that, please. First, in Huppert, there was a section in Huppert that talked about retaliation for testifying against the officer's employing agency on behalf of another former employee of that agency in a civil action. And Huppert didn't find any problem with affording that first amendment protection. It talked about a case from the Third Circuit and another case from the Seventh Circuit. And it said, well, you know, an officer may have an obligation to report crime, but that doesn't necessarily carry over to testifying in a deposition in a civil action. So Huppert was okay with that. And the other Ninth Circuits are okay with that. The rest of the country was okay with that. And that's one of the claims of this case, that in September of 2010, or excuse me, September 2011, there was a, Andrea Heath set for a deposition in a case that I had, where she divulged the same things that she's divulging in a private deposition. She wasn't, that's not the reason she was deposed, but that's what came out of her civil deposition. And within three weeks of that testimony, she was fired. So. Well, you have all, okay, I guess on the 1983 part, are you alleging a Monell claim? Yes. Okay. Then what is the basis of your claim? Is it policy, practice, or custom, a final decision maker, made or ratified decision that caused the constitutional violation, or both? Your Monell claim isn't really well articulated. Maybe it could have been pleaded better, and if I was back in the district court, I could file an amendment complaint. But the Monell. Well, tell me how you would plead it better. The information that we obtained in this other case, and online, unbelievably online, there was FBI witness statements that were posted on PACER, on PACER, of various Desert Hot Springs officers and supervisors, in response to a motion in Liberty to exclude other bad acts in the criminal trials of the officers that the plaintiff was complaining about. And these officers, not just the plaintiff, but Sergeant Ron Hull, Gustavo Pais, who's a sergeant, all these other officers all complained that there was two factions in. So you're alleging a pattern in practice. Oh, boy, is it ever. Well, that's what Judge Carlin asked. Yeah, it's the worst one I've ever seen. I mean, they literally had the department divided into the lettuce eaters and the meat eaters, and in order to get off your probationary period, you had to beat somebody up and put them in the hospital. That's how bad this was. So you have a custom and practice. Are you also alleging ratification? There's absolute ratification. By whom? By the city manager and the chief, by everybody. And are you also alleging a final decision maker being involved? City manager and the chief. All right, so that's your Monell theory. Yes, plus custom and practice. They would do what the plaintiff alleged there. And obviously that's not in your complaint now, so you would have to amend it, correct? I don't know that that is in my complaint. Well, nothing you said to us today is in your complaint. We allege that. I mean, you allege generic Monell claim, but none of the facts that you're talking about today are in there, or very few of them. True? I'm not criticizing. I really thought I alleged more facts than you're describing. Okay. Okay, but it's not going to be a problem. It's not going to be a problem. You know, there was a prior case in the Ninth Circuit that said all you've got to do is say policy, custom, usage, practice, and that's enough to get you in on a Monell claim for pleading purposes. Well, I think that's not – I think Twombly requires more than that. Well, Twombly does apparently now require more than that. Yeah, and the fact that the district court dismissed against you that to be an indication to you that maybe if you have more, you should say more? There's plenty. There's plenty. So you're down to less than four minutes. Do you want to reserve for rebuttal? Yes. Could I ask you one quick practical question? As a practical matter, why don't you bring – why are you spending all this time trying to establish a federal claim when you seem to have viable claims under California law that don't cause – that are not affected by any of these legal issues? 1102.5 of the Labor Court of California has a statute that's retaliation for whistleblowing, essentially, which is the same thing except you can't go against the individual officers. You can only go against the employer, and you don't get attorney's fees. So attorney's fees is the difference. It's always a driving force. No, no, I understand. I'm just trying to understand that. What are we hearing? Something on the radio. And you can't get punitive damages. Okay. And there's also – You have an exhaustion problem with the state ones too, right? I don't believe so, no. I don't have an exhaustion problem. Did you exhaust those? Yes. First, there was an argument by the defense that you have to file a claim with the labor commissioner to make an 1102.5 claim that's not supported by California law, that is not supported by anything. You don't have to. In fact, one of the exhibits we included was a letter from the labor commissioner to a private attorney on this exact issue that we asked the district court to take judicial notice of. And also in the – Good morning. May it please the court, my name is Laura Colty with Liebert Cassidy Whitmore for appellees the City of Desert Hot Springs, Patrick Williams, Edwin Smith, Kate Singer, Jason Simpson, Rick Daniels, Gabriella Mendoza, and Gustavo Paez. I am here with co-defense counsel, Mr. Sloan Simmons of Lozano Smith, who is representing appellees Tapia and Sclafani, and he will use approximately seven minutes of our time. We'll split it in half. I am primarily going to address the Monell issues, and Mr. Simmons will be addressing the qualified immunity issues in the event the court does have any questions. This court should affirm the dismissal of the Section 1983 claims. The city appellees presented numerous alternative arguments to the district court and to this court, which established that appellant's complaint was not viable and cannot be viable. This court may affirm the district court's decision on any grounds supported by the record, whether or not the district court specifically relied upon such grounds, and that's based on the Yanomoto case. Well, but here the court relied on Huppert and, you know, relied on a situation that the law changed after. But that being said, under the customer practice, the Ninth Circuit has held that a customer practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded, and that's Hunter v. County of Sacramento. You know, why either hasn't Heath alleged enough for that, or it's certainly why can't she if she were given an opportunity for leave to amend? You know, I mean, unfortunately you have a backdrop of a fairly difficult factual situation that it turned out that one of the officers that she reported on went to a jury trial, was convicted, and went to prison, right? So it's not as if other people didn't, you know, it's not as if, you know, while we might like to allege that a person had mental health issues or whatever, I mean, 12 jurors convicted this guy, right? Yes, but ultimately it was not pled, and we don't believe that it can be pled. What wasn't pled? Custom, policy, and practice. The only paragraph on custom, policy, and practice is paragraph 18 of the complaint, which is page 58 of the record. Right, but why can't it be pled? I mean, this was the 12B6 dismissal, and it was dismissed on the basis of now an overruled authority within the circuit. So it goes back down. Why don't you think there's a viable amendment that they can make alleging policy, practice, or custom? One, I'm concerned about a waiver argument. The fact is, both in the opposition to the motion to dismiss and the reply before this court, at no time has counsel indicated what he would do to amend as to custom, policy, and practice. So the fact that we're hearing it now for the first time, an oral argument, is concerning to me, and there is authority to support that these arguments have been waived. Can I ask you, is it that he didn't use those magic words, or can you infer that from the specific allegations in the complaint? Can you infer that? I mean, does he have to actually use the words to give you some notice of what he's talking about? Well, I believe the authority requires the appellant to make the connection. And, yes, there are numerous factual allegations as to what various officers and city staff purportedly did, but it doesn't draw the connection between how this was purportedly condoned behavior as a matter of practice over an extended period of time. Well, except if you look at the facts here, and I'm agreeing with you that perhaps they're not alleged correctly, but you have a police chief that there are facts out there that I think that could be brought in, and I don't know whether a jury ultimately believes, but the police chief tried to talk this police officer. According to you, if we have to take what she says is true, that she was contacted and told, don't go talk to the FBI, and while you may have other explanations for that, you have her allegations that she wasn't being backed up on calls. At one point, I don't know, the shotgun in the car didn't have ammo in it. She was being sent to do, you know, that pretty much people were taking their time to get there, and you set a timeline up, and after every time she goes and talks to the FBI, then something happens. And so why can't all of those be alleged, and then it goes to a jury for them to decide, is your explanation of those facts correct, or is their explanation correct? Well, it's a fair point. We're certainly a long way from a jury. Right. I will say that also included in the allegations in the complaint are a number of facts alleging that the chief and human resources were specifically cooperating in the FBI investigation and coordinating Ms. Heath's conversations with the FBI. So to say that there was a practice discouraging free speech is contrary to the allegations of the very complaint. Well, that's why you might win at trial. But if she were alive, but even that there are statements that allegations that she was contacted by either a proxy of the chief or by the chief himself telling her, was the chief a man or a woman? The chief was a man. Man. Okay. Not to go talk to the FBI. One, don't go until you're back at work, and, you know, you may have an explanation for that. And another, I think a proxy said, don't go. I mean, that would be their argument. I'm not saying they'd win, but that would be their argument. And this is a 12B6. Well, and again, I would point to the fact that we've never heard that until today at oral argument. And with these claims on the line, both in the opposition to the motion to dismiss and the reply brief, why wasn't it articulated how, in fact, there was a custom policy in practice? Well, let's assume you're right. And we agreed with you. Wouldn't we remand with instructions to allow him to file an amended complaint, particularly given the fact that the case was not dismissed on those grounds and he didn't have an opportunity, which he normally would have been given an opportunity to replead? Well, we do believe it would be futile to amend, to remand and allow leave to amend, given the fact that to date they have not been able to articulate how, in fact, there is a custom policy in practice. And I believe there also are significant concerns with respect to, well, that gets to the proof issues down the road. But I also want to make sure to address the final decision-maker argument, which there is judicially noticeable facts based on the city's municipal code and city charter, which shows that none of the individuals included in the complaint are final policy makers for purposes of a Monell argument. Okay, but if the record were developed and they could show that the chief had knowledge or that the chief, you know, if, in fact, the final decision-maker, if you rely on those cases, you know, what if the final decision-maker is just a rubber stamp and never looks, you know, he's aware of all these other things and never, you know, and never looks to what the evidence actually is? I would bet that those cases, the city manager doesn't institute IA investigations, does he or she? Not in the police department. Okay. And so essentially the recommendation to fire someone comes from IAs and everything that happened internally, and then the chief makes that recommendation to the city manager, and then the city manager makes the final decision is what your point is, right? No, the city manager does not make the final decision. It goes to binding arbitration and outside authority. With my 30 seconds of time, I do want to briefly address the issue of the state law claims. And, again, nowhere in the opposition to the motion to dismiss, nowhere in the appellate reply brief does council address a tort claim that was filed back in December 2010 so that all of the state law claims are barred for failure to comply with the timing requirements related to the California Tort Claims Act. Didn't the city manager act in this case in terms of the hearing? The city, so if we're going to go to Ms. Heath was ultimately, the city went through the interactive process due to a psychological and mental disability, and ultimately there was a determination to disability retire her. There was a Skelly meeting with the chief, and then the city manager, because that specific had been delegated to him that he would be able to make a determination on a disability retirement. Right, but they allege that that's a retaliatory act and it was made by the city manager. True? That they allege that? Yes. They allege that's part of the retaliatory part of this. So you have a final, you have an act at least on that, in that instance, that's made by the city manager who is the final decision maker. But there is a city council policy or ordinance which specifically delegates that specific task to the city manager. Right. So again, the final policymaking authority is coming from the city council. So you can't make a, you can't defend on that by saying that the city council then has to act on this when they've delegated it, he is the final decision maker. So why isn't that enough to get past 12B-6? Well, as to the policymaker, ultimately it was still the city council who made the determination to delegate this administrative act to... Do you have a single case that says that the city council has to act to be the final decision maker in matters of city government? It's not a matter, there is a case on this, actually. And it also, it's a matter of how the specific municipal organization defines who are the policymakers. Well, I don't want to, I don't want to, you can, you can, we can look at that. There is an authority in the brief, and I'll go ahead and turn it over to... Could I ask you one more question? There is, in another context, the Supreme Court has quoted with favor the following proposition, the repeated nature of harassment or intensity constitutes evidence that management knew or should have known of its existence. And what I, the way I read this complaint is that she was subject, over a long period of time, to an extremely hostile work environment, terminating in her, terminating in her dismissal. And doesn't this fall within the concept that because of the repeated nature of the harassment and its intensity, management should have known, knew or should have known about it, and at least deemed to have ratified it? Well, I have to accept the allegations as true. But what the allegations also include is the fact that she was out of work for extended periods of time in 2007, in 2008, in 2009, in 2010. Well, the question is what, the question is, the question really is what was the cause of that. I mean, she was subject to what I regard to be a terribly hostile work environment. And as Judge Callahan pointed out, many of those hostile acts coincided with cooperation that she gave either to the FBI or to testifying before the grand jury. And so we don't know, I mean, you could read this complaint as being consistent with the fact that they drove her to suicide. Well, I certainly don't agree with that. But ultimately she was out of work for almost a four-year period of time. To say that the city manager was aware of how she was being treated during a time when she wasn't even at the workplace, I don't think that we can. Well, but if you're, but if ultimately you're going to fire someone or ultimately whether the city council is going to fire someone, if you're kind of making the final decision making, you know, saying who's the final, do they just rubber stamp whatever anyone says if they're not the final decision maker? I mean, don't they have to get some sort of knowledge before they do it? You're talking about the council? Well, but it's always, the fingers are always pointing somewhere else and saying, well, you can't pull this, that person wasn't the final decision maker. And then you're saying, well, they weren't aware of all of this going on. Well, if they, whoever the final decision maker, do they just rubber stamp whatever goes on in the police department? Or do they have to make themselves aware of what the basis is? Certainly not. But I also want to be careful. I want, I'm understanding a distinction in the terms final decision maker versus policy makers. And I believe the Minnell arguments focus on policy makers. And yes, there are Skelly arguments related to who are making the administrative decisions along the way. And there are decisions made by the chief and the city manager. But that's different from policy maker, which is what I believe the Minnell authority relies upon. I'll go ahead. So what, could you complete the thought? So that's, and so what follows from that distinction? So it follows from that, that none of the individual defendants are final policy makers. Therefore, under at least the second theory related to Minnell, that there is no liability there for the city as a matter of law. Yes, under your theory, then the city council would have to vote affirmatively to retaliate against this person in order for them to be in liability. And I don't think that flies under Minnell theory. It's only one of the alternatives. And we're talking about basing liability as to the municipality based on the acts of individuals. And only those individuals with policy making authority. Because we're saying that effectively retaliation. Do you agree that the chief of police has got policy making authority? Not ultimately. Ultimately, certainly the city council didn't do it. And it's probably, I would doubt, although I don't know, that the city manager wasn't even consulted about every personnel act that occurs in the police department. Don't we have to look at this in a realistic way? Well, I think when we're talking about municipal liability based on a constitutional violation, it is a very high standard to say that these people as a matter of, it was such a practice that it was a policy at the department to retaliate against officers who spoke out related to potential excessive force. That is a very high standard. And I don't think that certainly based on the current allegations, and I'm skeptical as to the ability to include allegations to reach that very high level. Right, but you're mostly talking about factual matters now, which is beyond 12b-6. I mean, they've alleged, they've technically alleged Monell violations, custom practice policy, final decision maker. You just disagree with what they mean in a factual context. Well, it's an incredibly conclusory allegation at paragraph 18 that doesn't tie to how in fact there was this practice. And until today, we've never heard any alternative basis for pleading that. Okay. Your time has expired. Don't worry. We'll give you seven minutes. I could see you sweating over there, and I've been in your shoes, so. And we'll give you a little more time for rebuttal to compensate as well. Good morning, Your Honor. Sloan Simmons of Lozano Smith here on behalf specifically of Appellees Sclafani and Tapia. But as Ms. Colton indicated, I'll be largely addressing your qualified immunity questions as well as any other questions you have as they pertain to Sclafani and Tapia. You know, it's an odd qualified immunity case in terms of clearly established because we have different acts occurring over different times to which the law, I think we have to take a snapshot at different periods of time to what the law is. So why don't you take me back to, this would be 2007, the first act, and tell me what you think the law was at that time. Because this is even pre-Huppert, right? Chief Judge Thomas, you're absolutely right. This is a very interesting factual scenario for qualified immunity, and perhaps including because Huppert made its job duties decision as a matter of law. Later. Later. But capturing some of the acts. Catching some of the acts. But we start with in 2006. The district court in Huppert reached the decision that Huppert's cooperation with the FBI and then the grand jury testimony was at that stage before the district court in 2006 part of the job duties and therefore did not entitle Huppert to First Amendment protection. So that's pre-first contact between Ms. Heath and Agent Novak with the FBI in 2007. So even at that point, we have an existing district court decision. A district court, not binding on the circuit. Absolutely. But one part of the analysis. And you have some out-of-state authority that seems to go the other way. You have some mixed out-of-state authority. The next case that the Ninth Circuit actually, that this court starts to tiptoe up to the issue is in Robinson, and that's in April of 2009. So there is the window between 2007 and 2009 where no Ninth Circuit case has really started to dig in on this issue. But if we're looking to what acts are alleged by Scafani and Tapia during that time period, we're talking way before the complaint was filed in this action. Well, but if you sort of, you know, I guess the problem that, you know, if you're taking that snapshot and say that there isn't anything, I find it hard to believe that any officer would, I mean, they arrest people for, officers arrest witnesses for intimidating witnesses and all of those. And if you take his allegations as correct, I find it hard to believe that any officer could think that it was okay. What you're doing when, you know, you're bullying someone, you're telling them not to report, you know, it's that cone of, you know, so I don't know what they, you know, that it's, if you want to be a rogue and if you want to report misdeeds of your fellow officers, then you're going to be, you're alone in that and you're alone on the street is essentially what they're alleging. I'm not, it may not be clear that it's a First Amendment violation, but I think it's sort of like if you asked a kindergartner, would that be okay to do that? And you ask any law enforcement officer in a hypothetical in an interview, would that be okay to do that? I'm pretty sure that they would all say it wouldn't be okay. Your Honor, and that makes perfect sense. That's what makes it hard here because the qualified immunity, and I was asking hard questions of appellant's counsel of if it's all over the place here, how could it ever be clearly established regarding a First Amendment violation? A couple of points on that, Judge Calhoun. On one hand, Lane v. Franks, which you brought up earlier, is a perfect example of another case where there was a factual scenario where you could look at it and say of course an individual's testimony in a criminal proceeding subject to a subpoena and truthfully testifying before a court, of course that should be protected speech. But the 11th Circuit had a split there with two other circuits and it was there in that decision that the Supreme Court less than two years ago said that with that scenario of different cases, it was not beyond doubt that speech in that context for that individual public employee was protected speech. And if that's the case in Franks, it's exactly the situation here, whereas as of July of 2009, just a few months after the Robinson case by this court, the Hooper decision comes down and finds as a matter of law, cooperation with the FBI, testimony before a grand jury, the two key speech components in this case is something that a police officer in California, understandably now no longer the law of the circuit, but at that time what that type of speech, reporting incriminating facts, was as a matter of law the duty of a California police officer. So your best argument to me might be that even though a police officer would know what he was doing is wrong and he shouldn't do it, but you can't shoehorn it into that he would know it was a violation of the First Amendment. Absolutely, Your Honor, and that's the distinction. There's alternatives. The appellant has raised claims under the whistleblower statutes under the California Labor Code in 110.2.5. There are remedies, and there has been discussions by courts about how at times the qualifying immunity analysis does maybe relieve liability from officers because of the absence of clearly established law, and it maybe doesn't feel just right, but it's the nature of the remedy. There are remedies for this. Did the district court do the kind of analysis that I don't want to take up, that Judge Thomas is asking you to do now, snapshot what was clearly established at the time of the acts? The district court did not. They looked at Hooper and said that because Hooper says what he says, end of story. But if you look at the scope of the allegations against, and I will only focus at this point on Sclafani and Tapia, if you look at allegations against those two individuals between 2007 when the first conversation is had with Novak, and then in July of 2009 when Hooper comes out, there's no allegations against Officer Tapia whatsoever. And when it comes to Sclafani, there are a couple of sparse claims that even if somehow you were to get to a place where you agree that some other time-barred acts weren't part of your consideration, there just isn't enough facts in that time period to say they were actually committing retaliation in a way that was in violation of clearly established law. And the Hooper ruling itself highlights that it wasn't clearly established law. There was no clearly established decision by this court to say that the type of speech that's at issue here and was issued at Hooper leading up to the Hooper decision was in fact clearly established. And the Dahlia 1 decision and its discussion about the impropriety of Hooper but the obligation to feel bound by it, all of these factors lead into a factual and legal scenario that within this circuit there simply was not clearly established law if you look at any snapshot of the time period that's relevant here. Let me ask you this because your time is getting short, overtime actually. Now, we're talking about snapshots. Melding together your theory of statute of limitations along with qualified immunity, what period of time do you think is relevant to look at for a snapshot? Well, in our briefing we argued that Morgan discrete acts apply. Assuming that, yeah. Assuming that, that the window that you are looking at from the first act of purported speech, if we assume the allegations are true in the complaint in April of 2007 when he talks with Novak and then you up until March, well, the allegations of any substance against Appiah and Sclafani cease to exist once you get to approximately September of 2011. There's no allegations really of material nature. And even for that matter, as of March 18th, 2010, there isn't any material allegations against them. Okay. Could I ask you about your reliance on Morgan? Yes, Your Honor. Morgan has an interesting discussion about the holding not being applicable to hostile environment cases and that it seems to me that what occurred here, regardless of how it was labeled, and the word hostile is somewhere used in the complaint, but she was subject to a hostile environment with numerous acts. Some of them might have been, could have been the subject of a discrete claim, but over a long period of time she was subject to, she was retaliated against by having a hostile environment created. And why isn't the portion of Morgan that carves out an exception for hostile environment cases to the statute of limitations somewhat more applicable here? Judge Corman, in Morgan, the statute at issue was Title VII. I know. Which provided for discrimination, retaliation, and the hostile environment claim. Right. Here, where we have a First Amendment retaliation claim and the elements that would follow through on that, including adverse action, the norm has been over time that usually acts of retaliation are more similar to and actually align with discrimination type acts. But there's a constant period in which this woman is being harassed over a period of years. The retaliation is by virtue of the creation of a hostile environment rather than necessarily any particular discrete act. I mean, ultimately she was fired. Of course, that's a discrete act within the statute of limitations. I think if you were to look at the allegations in the complaint, there's a variety of which I think can clearly be identified as discrete acts. She indicates her first allegations that she was demoted when she returned from leave. No, I understand that, but it's all part of a pattern of a hostile environment because of her cooperation, making complaints, talking to the Bureau, testifying before the grand jury, testifying in a civil proceeding. She's constantly being subject to harassment. Your Honor, I would say, and I speak at this point, based on my understanding of the allegations against Lafonte and Tapia, that if you look at, because in order to do that reach, to look at a hostile environment and go back and look at some of those earlier allegations as a hostile environment, there needs to be some actionable conduct within the applicable time period. And if you look at the complaint, when it comes to Lafonte and Tapia, there are not materially adverse actions or even incidents that would rise to the level of being considered part of a hostile environment in the time period. Well, can't one infer that this was not being done without their knowledge? I mean, after all, she was being subject to the hostile environment because of her complaints against these two officers. And it just seems to me to be somewhat inconceivable that they weren't aware of it and were not a party to it. I mean, it's a question of circumstantial evidence. I mean, you're talking about dismissing a complaint on its face. I understand your question, Your Honor. In terms of my representation of Scafani and Tapia, I would say that broader. What policymakers, et cetera, were they aware of? And I think Ms. Colty addressed that in greater degree. I mean, I look at this case in terms of the appellate documents. But they were the principal beneficiaries of all of this. And they didn't know what was going on, and they weren't. You can't draw, at least for the purposes of a pleading, an inference that they were a part of this, what I would describe loosely as a conspiracy. Well, Defendant Tapia was an officer, a junior officer, not in any degree of the seniority of the other individual defendants involved in this case. And so I don't think he falls into that supervisory role of any sort where he can be condoning activities. And then if you look at Scafani, he's actually taken in by the marshals, ultimately returns for a period of time. But by March of 2010, Keith is no longer in the department on a day-to-day basis. And the interactions and allegations in the complaint post-March 18th of 2010, there is no detailed allegations relative to specific wrongs by Scafani. Thank you, Your Honor. I appreciate it. Thank you, counsel. Rebuttal? There are direct allegations in the plaintiff's complaint claiming that the city manager and the assistant city manager were engaged in a conspiracy with the chief and the command staff and everyone else over at Desert Hot Springs PD to retaliate against the plaintiff. One thing that I do want to mention is that Huppert didn't deal with a situation where the officer was out on medical leave and had no official duties whatsoever. And I think that being the case, that may leave a window for individual liability as well as based on… She was still being paid. No, she was not being paid. She was not being paid. She was out on medical leave, she was not being paid, and she was receiving medical disability benefits. She had no duties at all. Well, don't the officers have some sort of… I can't remember what they call it, but it's like for a year they get paid their salary. It's… I don't know. I want to say something like $2,800, but that's not… Is it $4,850? I'm seeing mouthing from the table. There's something where they get paid like for a year when they're… Was she on that kind of leave? She was on medical disability leave and received disability benefits. From whom? Social Security or the city? I believe the state of California. She had a state disability. Also, the… Huppert did mention, one of the things that Huppert stressed was that Huppert and a gentleman named Salgado claimed that they weren't acting pursuant to their job duties because they were acting in contravention of the orders of their supervisor, of their superiors. And they made a big deal of the fact that where they say, well, this is one of the clearest examples of speech pursuant to one's job duties, though Huppert and Salgado would have us believe that they acted outside the chain of command by continuing their investigation in direct contravention of Baker's demand that they cease. Hendricks ordered them to continue, so there was this issue. But the only thing that was pleaded in that case was that Huppert made these complaints to the L.A. Sheriff's Department and to the Department of Justice in contravention of orders, against orders, and that shouldn't be considered job duties either. As far as the statutes of limitations issue, even after March 18th, the city made Anthony Sclafani, defendant Sclafani, the one who was the prime target in this case for the plaintiffs, they had him vetting police… Well, after he was indicted, they had him vetting police officers to determine whether or not they would be hired by the city. I mean, he was in there. He was supposed to be the next chief. He was one of the guys. And so there was this giant conspiracy. There are exceptions to Huppert. There are things that Huppert talked about that aren't dispositive of the plaintiffs' claims against the individuals. As far as the Morgan Doctrine, the statutes of limitations, on the state law claims, it's different than Morgan. On the state law claims, you have the continuing violation doctrine. And then, as Your Honor mentioned, one exception to Morgan, I guess the adoption of the continuing violation, is this hostile work environment where you don't have an act that becomes a discrete act, but it's more of an ongoing pattern of harassment. How does that work in the First Amendment context? I mean, I understand it in the Title VII context, but tell me how it works in the First Amendment context. It would be the same way. It would just be… But the hostile work environment isn't established under 1983. It's got to be a constitutional violation. But the constitutional violation is not just that somebody committed an act, and not just that the defendant wanted to retaliate against them, but that they actually did something, that they actually did retaliate against them. So you can have an act that happened 20 years ago, and then somebody retaliated down the road, and it's down the road that matters for statute of limitations purposes. I don't know. I think we're talking past each other here. I'm not… Okay. And the city manager and the assistant city manager, the ones that conducted the Skelly hearing, they were in a conspiracy with everybody. This was a 23-officer department. Okay? It's not a very big department. And of the 23 officers, eight were under a U.S. Department of Justice investigation for torturing people. This was not like LAPD, where you have 6,000 or 7,000 officers, and the L.A. Sheriff's Department, you've got 6,000. This was a little group of people that were divided into people that like to use force on others and people that don't use it as a first resort. They all knew each other. They knew what they were doing. They knew what they were saying. And then they take the guy who gets indicted, and rather than put him on admin leave, they put him in charge of vetting their officers. Could I pick on something you just said earlier? You said under the California statute of limitations, there's a difference in terms of discrete acts. If they're related, if the discrete acts are related to each other, then they suffice. You don't look at each one and can't start the statute of limitations running from each one. Did I understand you correctly? Is that what you said? It doesn't have to be the exact same type of retaliation. It could just be that it's retaliation for a particular act. I mean, is it different from, let's assume Morgan applies here, is it different in California than it is under Morgan? Yes. Well, that's what I wanted to pick up on. I thought for statute of limitations purposes, we apply California law. You're supposed to, yes. So why don't we pick it all up? You know, I have yet to be able to explain things that don't make sense. And sometimes either the left hand doesn't know what the right hand is doing, or the left hand doesn't care what the right hand is doing, or the left hand doesn't know there's a right hand. Well, you're not making much sense right now to me. I mean, you're not being persuasive. There are times when there are decisions. You're saying, yeah, there are decisions going one way, going the other way, but in this context, make your argument. In this context, the federal courts are supposed to adopt state statute of limitations, unless there's some statutory statute of limitations that Congress has, just like Wilson v. Garcia for Section 1983 actions, and they're supposed to adopt state tolling doctrines. For whatever reason, Morgan didn't adopt the state tolling doctrine. I don't know why. I can't get inside the judge's mind, but they didn't. The justices. The justices of the Supreme Court. Yes. Because I was on the Morgan panel, and we went the other way. Okay, well, they didn't adopt it. So, you know, if they say up is down, then up is down. I'm not going to disagree with them. They get to say what the lie is. And I think... Any further questions? No. No, thank you for your argument. The case is here to be submitted for decision. Thank you all for your arguments, very helpful this morning.
judges: Korman, Thomas, Callahan